IN RE ERNEST H. O'BRIEN.

February Term, 1919.

Present: WATSON, C. J., POWERS, TAYLOR, and MILES, JJ.

Opinion filed April 19, 1919.

*Disbarment Proceedings—Uttering Forged Instrument—Perjury—Attorney and Client—Withdrawal of Attorney from Case—Leave of Court.*

Proof that an attorney conspired with another person to utter a forged instrument, and knowingly gave false testimony concerning said instrument and his acts and doings in relation thereto with the intent to deceive the court into finding that said instrument

was genuine, shows him to be unfit to practice as an attorney at law, and he will be stricken from the rolls.

No attorney or solicitor can withdraw from a case after he has entered his appearance upon the record, without leave of the court.

DISBARMENT proceedings, on complaint of the Attorney General. Heard at the February Term, 1919, of the Supreme Court for Rutland County, on the report of the commissioners appointed to hear the case.

The commissioners to whom the case was referred reported:
. That they heard counsel for the defendant and the Attorney General on January 6, 1919, in the matter of the defendant's motion to defer the time of hearing until after the trial of a certain criminal cause pending in the county court for the county of Rutland, in which the defendant was charged with perjury in connection with the matters and things set forth in the complaint of disbarment; that they declined to entertain such motion as being proper to be made only to the Supreme Court, and January 21, 1919, was fixed as the time of hearing.

That on January 21, 1919, the defendant appeared by his counsel who presented to them, as a motion for continuance of said hearing, a statement signed by the defendant, in substance, as follows:

"At the January Term of the Supreme Court, my attorneys moved the Court to have it postpone your sitting until after the trial of the criminal cause of the State against me, in which case I am charged with having committed the crime of perjury. The Court denied that motion. Thereupon I filed a petition with the Supreme Court, asking that my name be stricken from the roll of attorneys and solicitors of the Supreme Court, stating as reasons for this petition, that my health, and the inability to get the necessary evidence for defence would prevent me from making a proper showing of my innocence. The Court has denied the prayer of my said petition.

"There are many other reasons for making these motions. In order to defend myself in the proceedings before you, it would be necessary to try many of the substantial issues of the criminal cause against me. One of the principal witnesses that can give evidence tending to establish my innocence of the charges in the complaint that you are to consider, is himself charged with per-

jury in a criminal case not yet tried, on many of the same issues that are charged against me. In the exercise of his constitutional right, he does not desire to be a witness in this case before his case is tried, and his attorneys do not feel that they should advise him to testify at this time in my behalf. Another important witness is charged with criminal conduct in the complaint before you, and has a constitutional right to decline to give evidence in my behalf at this time.

''Notwithstanding the decision of the Court that the hearing on the complaint before you shall not be postponed to await the trial of my criminal case, I beg to state that I do not feel myself warranted in going into my defence on that complaint before the trial of my criminal case. I am of the opinion that a full defence in this proceeding cannot be had at this time, and a partial defence would seriously prejudice my defence in the criminal case.

''As the matter appears to me and to my attorneys, I am put in the embarrassing position of choosing between defending myself fully in the proceeding before you, and thereby impairing my chances in the criminal case, or decline to make a full defence in this proceeding and thereby better preserve my chances of success in the criminal case. Between these two alternatives I cannot hesitate to choose. An unfavorable result of this proceeding would at most only deprive me of the privilege of practicing law, while an unfavorable result in the criminal case would take away my liberty and brand me as a criminal. My liberty is more precious to me than membership of the bar, although I prize that of great importance, especially in view of my long and arduous struggle to obtain it. I am therefore compelled to take the chance of my innocence appearing by an *ex parte* evidence of the State without developing my defence at this time, rather than to hazard doing anything that might jeopardize the defence of my liberty. But, if I did judge it best to make a full defence before you, I know that I am not physically able to do so. The state of my health forbids that I should attempt the prolonged mental strain that a full defence would require.

''I understand too, that it is the intention of the State to take considerable evidence outside of the State, and I am not in a physical condition to undertake the effort of attendance upon the taking of such evidence. I would say too, that, because of

my long and serious illness which involved two capital operations, I have not heretofore been able to assist my attorneys in making a due preparation of my case at this time. It is but recently that I have been able even to leave my house, and I have found that mental labor soon wearies me.

"The case, if fully presented, involves an immense amount of details, and the sifting and arrangement of them is a matter for a man in vigorous health, and I am conscious that I am not physically able to properly participate in such labor.

"Because of the facts herein stated, I respectfully decline to further participate in the trial of this case at this time, and desire that the cause be continued to a time when I can fairly present my defence.

"Therefore, I respectfully submit to the discretion of this commission to take such action as it deems proper and fair in the premises."

That the commission refused to continue the case, because: "So far as the existence of this criminal case that is to be tried is concerned, we should not be justified in continuing the case because of that, because that was the question you took to the Supreme Court and has been passed upon. That as to the possibility of some of the witnesses now charged with some criminal offence claiming their privilege and refusing to testify, we should hardly be justified in continuing the case for that reason, in trying to forecast what they might say or refuse to say. We can only deal with those things as they come. As to the statement made here by the defendant, by his attorneys, as to his physical condition and inability to go on with this case, we say that we should hardly be justified in continuing the case on that statement alone; that if the case was to be continued by reason of the illness or sickness or inability of the defendant to participate in these proceedings, it should be upon such proof as to fully satisfy the commission of that fact and justify their action. As the case now stands we think the hearing should go forward."

That thereupon said counsel for defendant withdrew from the hearing and did not further participate therein before the commission, although one of them remained in the court room as an observer and listener throughout most of the hearing.

The commission further reported that, after hearing the evidence produced by the State, they found as follows:

"In October, 1916, the Supreme Court of Vermont rendered a unanimous decision affirming a decree of the court of chancery, Rutland County, awarding damages to the Vermont Marble Company against George P. Eastman which amounted to about $24,000, including interest, and established title in favor of the Vermont Marble Company against said Eastman and Percival W. Clement to a strip of valuable marble land in West Rutland, about three rods wide. This suit involved the determination of a disputed boundary line, and, if the claim of Eastman and Clement as to said boundary line had been established in said suit, not only would said award of damages against said Eastman have been avoided, but said Vermont Marble Company would have become liable in damages to said Eastman and Clement for a large amount of marble quarried by said company on the disputed land. Following said decision, and on October 11, 1916, said Eastman and Clement filed their motion for a re-argument of said cause, which was denied by the Court May 1, 1917. This cause is reported in 91 Vt. 425 (101 Atl. 151), to which we refer. The mandate was filed in said court of chancery May 4, 1917. Tuesday, May 7, 1917, was fixed for the settlement of the final decree, and on that day attorneys for Eastman delivered to attorneys for said company a motion to amend their pleadings by way of a proposed supplemental cross bill, based upon a document bearing date of July, 1892, and alleged to have been newly discovered on May 6, 1917. Said document is known as Plaintiff's Exhibit No. 1.

"On May 16, 1917, said Eastman filed in said court of chancery in the cause above referred to his motion for leave to file supplemental cross bill therein. This motion was also based on said document as newly discovered evidence in said cause. Upon hearing, said motion was denied on July 27, 1917.

"On July 28, 1917, said Eastman and Clement brought to said court of chancery their petition for leave to file in said cause a supplemental bill in the nature of a bill of review, based upon said document as being newly discovered evidence in said cause. Indeed, in said proceedings for review it was claimed by said Eastman that this document would render impossible the making by the chancellor of certain findings of fact, and the making by the court of the decree relating to said boundary line and damages, that had been made in said cause, and we are satisfied that such claims as to the effect of said document, if genuine and re-

ceived in evidence in said cause, were well founded. This document purported to be an agreement fixing the boundary line, that had been litigated in said case, in accordance with the claims therein of Eastman and Clement, and also containing twenty-five year options from said company which, if exercised, as said Eastman on May 17, 1917, attempted to exercise them, would take from said company interest in land deeded to said company by said Eastman in November, 1911, under a decree of said court of chancery, in the cause of *Vermont Marble Company* v. *Carlos E. Mead and George P. Eastman,* reported in 85 Vt. 20, 80 Atl. 852, to which we refer, as well as other interests in the same land and other lands adjoining thereto.

"The Vermont Marble Company filed its answer to said petition, and thereby put in issue the genuineness of said document and its character as being newly discovered evidence. Issue being joined, hearing was had thereon in October, 1917. No decision having yet been rendered, on February 14, 1918, the Vermont Marble Company moved to open the cause for the purpose of taking additional evidence in New York. The following day, and in compliance with their request, written notice was given to said plaintiffs' attorneys, by said company's attorneys, setting forth the names and location of certain witnesses, whose evidence it was so proposed to take, and a general statement of certain things their evidence would tend to establish, including statements and acts of said Eastman tending to show, as it was claimed, that after November 5, 1916, he was engaged in or contemplating the making of said document. On the same day, February 15, 1918, upon hearing, said cause was ordered re-opened for taking such evidence, whereupon certain of the attorneys for said Eastman and Clement went to New York to investigate the matters referred to in said notice.

"Before the evidence in New York was taken and on March 8, 1918, Eastman's attorneys filed their motion requesting the chancellor to set a time and place when said Eastman might be heard to make some corrections in his testimony formerly given in the case, and thereon, on the same day said Eastman was heard. At said hearing said Eastman corrected the testimony he had formerly given in said case, namely, that he did not know of the existence of said alleged written agreement before May 6, 1917, by testifying that he did know of it before May 6, 1917; whereupon his attorneys moved for a discontinuance.

Attorneys for the Vermont Marble Company insisted on an order dismissing the case with costs to them and with judgment in their favor, and it was thereupon ordered by the court that said suit be dismissed and judgment entered for the defendant company with costs, said judgment order being filed on said March 8, 1918; and pursuant thereto said company subsequently received nearly $27,000.

"This alleged agreement (Plaintiff's Exhibit No. 1) purporting to have been made and entered into July 18, 1892, to have been executed by the Vermont Marble Company by Fletcher D. Proctor, President, Fletcher D. Proctor, George C. Robinson, John W. Howe by A. L. Burbank, attorney in fact, John H. Mead, Harvey T. Buck, Charity R. Burr and Carlos E. Mead by P. M. Meldon, attorney in fact, and Rutland White Marble Company by C. H. Fitch, President, and to have been signed by Joel C. Baker, C. C. Perry, George E. Royce, George C. Underhill, S. E. Smith, J. B. Hollister, J. E. Manley, George J. Wardwell, F. G. Swinington, and P. F. McManus as witnesses, we find not to be a genuine instrument. * * * * *

"We find that the alleged agreement in the typewritten part thereof was written on a Hammond typewriter, and that the style of type used on said Hammond typewriter or certain characters used in writing said agreement were not manufactured or in use until some years after July 18, 1892, the date of said agreement. * * * *

"On all the evidence produced before us we are agreed and fully satisfied that said written instrument, Plaintiff's Exhibit No. 1, is not a genuine instrument but a forgery. From the evidence before us, we are unable to find exactly when or where said written instrument was forged. Considering the motives which we find he had to do so, however, and from all the evidence in the case, we find that said Eastman forged or caused to be forged said Plaintiff's Exhibit No. 1, at some time not earlier than the year 1916.

"We find that the defendant, Ernest H. O'Brien, is an attorney of the Supreme Court of this State, and was such attorney during the times he conducted himself in the manner hereinafter stated. At the trial of the proceedings for review, hereinabove referred to, in October, 1917, said O'Brien testified among other things, in substance, as follows: That he found the alleged written instrument in the office in which he practiced in

Rutland, Vermont; that this office was the same office occupied by Joel C. Baker in his lifetime and down to his death in 1904; that said O'Brien had occupied the same office since that time, and that said written instrument was found by him in the old files of said Joel C. Baker, in a verticle document file which had been in that office ever since O'Brien went there in 1899; that he found said written instrument and other papers with which it was, the same year that he built his garage and either four or five years ago the coming winter (referring to the winter of 1917-1918) ; that, after his discovery of the said written instrument, it, together with said other papers, had been kept in his old safe until November, 1916, when he transferred them to a new safe he then bought, where they remained until one Sunday in May (referring to the month of May, 1917) ; that his attention was called to these papers about that time by reading in one of the local papers a decision of the Supreme Court in the Eastman-Vermont Marble Company case, also that Mr. Lawrence had made some motion before the Supreme Court in reference to that case; that at the time he took occasion to look at said papers again and after that, not far from noon, on a Sunday, delivered them to Walter C. Fenton, one of the attorneys for the plaintiff in the case then on trial before Chancellor Fish; that before that time he had the custody of the said papers for the last three or four years; that he supposed they had been in the file; that he found them in the file; that after the finding of said written instrument he did not tell any one anything about it until the time when he turned it over to said Fenton upon that Sunday in May; that on the occasion when said O'Brien went to Albany, N. Y. on May 5, 1917, he received four hundred dollars; that on that occasion he did not see said Eastman at Albany; that the two purported signatures of Joel C. Baker upon said document were, in his best judgment, the signatures of Joel C. Baker, and the purported signature of Thomas W. Moloney was, in his best judgment, the signature of Thomas W. Moloney; that the figures and words written in ink on said document, namely '18 July A. D. 1892' and 'of James Brown dated Sept. 27, 1866' were, in his best judgment, in the handwriting of Joel C. Baker; that the last time before May 6, 1917, said O'Brien saw Eastman to have conversation with him, was when said O'Brien brought suit against several parties in West Rutland in which Eastman was interested, and that was a year or two prior to May 6, 1917;

that when said O'Brien was in Albany on May 5, 1917, he met a man by the name of Stiegel at the Stanwix Hall Hotel and conferred with him about two hours; that said O'Brien hired and paid for the room he stayed in; that said O'Brien did not say to Attorney Frank C. Archibald that the Vermont Marble Company had done what it could to injure the said O'Brien and that said O'Brien was going to get even with it; that said O'Brien did not say to said Archibald that the said O'Brien had a case for damages at one time pending against the Vermont Marble Company which it settled out from under him, and, because it had done that, he, the said O'Brien, felt unfriendly toward it and had made up his mind when the chance came he would get even with it.

"At said trial said Eastman testified, among other things, in substance as follows: That he first knew of the existence of said written instrument on May 6, 1917; that he was in New York City on May 5, 1917, until he left for Boston about midnight; that in his said testimony he gave a detailed statement of his whereabouts at different times during the evening of that day. He was cross-examined at length on the question of when he first knew of the existence of said written instrument, and at all times adhered to his testimony that he did not know of it before May 6, 1917.

"We find that said O'Brien, in Rutland, on Saturday, May 5, 1917, was expecting a telephone communication from said Eastman, in New York; that that afternoon, while O'Brien was absent from his office, he received several urgent telephone calls from New York, and upon his return to his office answered said call and communicated by telephone with the person calling him; that he then went to Albany, N. Y., arriving there that evening, and there met said Eastman at the Stanwix Hall Hotel, where Eastman was registered under the alias of 'G. L. Brown, Boston,' and assigned to room 63, to which room O'Brien was also assigned upon his arrival; that on this occasion they were both escorted to said room by the bell boy who then knew Eastman and afterward identified O'Brien; that they both occupied the said room and were there together; that some hours later said Eastman left Albany for Boston where he arrived the following morning, and that he paid for the room so occupied in Stanwix Hall Hotel, both for himself and for O'Brien, before leaving;

that O'Brien returned to Rutland the following day, Sunday, May 6, 1917, and at about noon of that day delivered to said Fenton Plaintiff's Exhibit No. 1, together with other papers.

"We find that said O'Brien did not find Plaintiff's Exhibit No. 1 in the old files of Joel C. Baker, a conclusion in which we are fortified by the fact that a certain character in the type-writing of said written instrument could not have been in use during the business life of said Baker, as above alluded to. We find that said O'Brien did not keep said written instrument in his safe until one Sunday in May, 1917. We find that said written instrument came into his possession through some arrangement and understanding between him and said Eastman. We find that their meeting at Albany on this occasion had to do with said written instrument, its supposed discovery, and its delivery to said Fenton on the day following. We are helped to this conclusion by the testimony of said O'Brien in said trial, detailing the cause and occasion of his presence there and what occurred there—an explanation both unreasonable and incredible.

"Therein he said he was called by telephone from New York by a man named Stiegel, with whom he had had no business or correspondence, whom he had never seen, and as to whose usual business he had no knowledge; that upon meeting said Stiegel in said hotel office in Albany, he learned that the occasion of their meeting was to consult about the formation of a corporation in Vermont; that he was called upon to explain the corporation laws of Vermont, but received no explanation from Stiegel as to the business the proposed corporation was to transact; that they also talked over the matter of some explosive but couldn't tell how long; that they talked about corporation matters for from fifteen minutes to half an hour; that he talked with Stiegel for about two hours; that there was another man with Stiegel, who was with them when they talked of corporation matters, but whose name he couldn't tell; that on this occasion he learned nothing whatever respecting Stiegel's past or what he intended to do later; that Stiegel did not give him his address in New York, or tell him where he lived or what state he lived in; that he received a fee of four hundred dollars for his services on that occasion, which was paid at the time, the fee being arranged before he left his office in Rutland. The register of Stanwix Hall does not show any person by the name of Stiegel, or Stiekel, or any similar name, registered there on May 5, 1917.

"We find that said O'Brien, soon after May 7, 1917, stated to Attorney Frank C. Archibald that he, O'Brien, did feel unfriendly to the Vermont Marble Company because it settled a case out from under him, and that he was going to get even with it.

"We do not find that said O'Brien knowingly had any part in forging, or conspired with said Eastman to forge, said written instrument, Plaintiff's Exhibit No. 1; but we do find that he, said O'Brien, did conspire with said Eastman to utter the same, he, said O'Brien, on May 5, 1917, and at all time thereafter, knowing that it was not a true and genuine instrument as it purported to be; that the testimony of said O'Brien and said Eastman, above referred to, was false in the respects above shown and was knowingly given in furtherance of said conspiracy and with intent to deceive the court into finding said written instrument to be genuine and to be newly discovered evidence in said case as it was alleged to be.

"The second count of the complaint charges said O'Brien with complicity in the use for evidentiary purposes in Rutland county court of a certain book of account, alleged to have been made up or manufactured for such purposes and not a genuine or original book of account.

"It appeared that the plaintiff in the case referred to in said count introduced in evidence in said court a certain book of account in support of his specifications filed in said cause, claiming, and so testifying, that said book was a book of original entries, and that the entries were in his own handwriting and made contemporaneously with the rendition of the services charged for; and that by reason of the plaintiff so claiming and testifying said book was admitted as independent evidence. This book contained a large number of entries extending from August, 1913, to November 25, 1915, corresponding in subject-matter with said specifications but differing therefrom in phraseology.

"It further appeared that said O'Brien prepared said specifications; that he was the plaintiff's attorney of record in said cause, and was present in said court at the trial thereof, and heard all the testimony of said plaintiff, but did not in fact take an active part in the trial.

"It further appeared that after verdict and judgment in said case in said court, he, said O'Brien, admitted and stated in conversation with associate counsel, in effect, that said plain-

tiff did not have or keep any book relating to the subject-matter of said specifications, but that he, said O'Brien, made up the specifications from such general data, memoranda, and information as he could obtain.

"Said book was not before us for examination and could not be procured, although the complainant had seasonably issued and served a subpœna *duces tecum.* The evidence presented to us, in the absence of the book itself, is not sufficiently informing to predicate a satisfactory opinion as to the true character of the book.

"Therefore, as to the second count of the complaint we are agreed that the charge therein made is not established and we so report."

*Frank C. Archibald,* Attorney General, for the State.

*M. G. Leary* for the respondent.

By THE COURT. It being established that the respondent conspired with another person to utter a certain written instrument, forged by such other person, said instrument then and ever after being known by the respondent not to be a true and genuine instrument as it purported to be, and that the respondent knowingly gave false testimony concerning said instrument, and concerning his own acts and doings in relation thereto and in connection therewith, in furtherance of such conspiracy and with the intent to deceive the court before whom a cause, involving the rights of parties, was to be or was being heard, into finding that said instrument was genuine and newly discovered evidence in said cause, a strong case is presented showing the respondent to be an unfit person to practice as an attorney at law, and he will be striken from the rolls.

After the report of the commissioners was filed and before it was acted upon by the Court, the respondent's attorney of record wrote a letter to the clerk of the Court stating that he withdrew from the case. But no attorney or solicitor can withdraw his name after he has once entered it upon the record, without leave of the Court. *Tripp* v. *Santa Rosa Street R. R. Co.,* 144 U. S. 126, 12 Sup. Ct. 655, 36 L. ed. 371. Such leave was neither asked for nor granted.

*Judgment that said Ernest H. O'Brien is removed from the*

*office of attorney at law, and from the office of solicitor in chancery.*